JS6

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| B.B., <br>     Plaintiff, <br><br>     vs. <br><br> CAPISTRANO UNIFIED SCHOOL DIST., et al., <br>     Defendants. | Case No. 8:23-CV-00306-DOC-ADSx <br><br> **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S FEDERAL LAW CLAIMS [81] AND DECLINING SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S STATE LAW CAUSES OF ACTION** |

Before the Court is Defendants Capistrano Unified School District ("CUSD"), Jesus Becerra ("Becerra"), and Cleo Victa ("Victa") (collectively "Defendants") Motion for Summary Judgment ("Motion" or "Mot.") (Dkt. 70). The Plaintiff in this case is B.B., a minor. For the reasons explained below, the Court GRANTS Defendants' Motion as to Plaintiff's two federal causes of action and DECLINES supplemental jurisdiction over the remaining state law claims.

I. BACKGROUND

  A. Facts

When B.B. was in first grade, she made a drawing (the "Drawing") that included the phrase "Black Lives Mater [sic]" printed in black marker. SUF (Dkt. 70-2) # 1. Beneath that sentence, B.B. added "any life," in a lighter color marker. Id. B.B. gave the Drawing to a classmate, M.C., who took it home. Id. # 3. When M.C.'s mother saw the Drawing, she emailed the school, stating that she would not "tolerate any more messages given to [M.C.] at school because of her skin color" and that she "trust[ed]" the school would address the issue. Id. # 6.

Later that day, the school's principal, Becerra, approached B.B. at recess. Becerra told B.B. that the Drawing was "inappropriate" and "racist,"[1] and that she was not allowed to draw anymore. PSDF (Dkt. 77) # 9; SUF # 10. He also instructed B.B. to apologize to M.C., which B.B. did twice. SUF # 11-10. When B.B. returned to class from recess, two of her teachers told her that she was not allowed to play at recess for the next two weeks. Id. # 14. The teachers did not tell B.B. the reason she could not play at recess, and there is no direct evidence that Becerra directed B.B.'s teachers to punish B.B. in this way. Id. # 19. This incident with the Drawing is the basis for Plaintiff's first cause of action for violation of the First Amendment.

Around one year after the incident, B.B.'s mother, Chelsea, and another parent were discussing an unrelated dispute that Chelsea had with M.C.'s mother. During that conversation, the other parent informed Chelsea about the incident with the Drawing. Chelsea then filed a complaint with the school, and went through several levels of appeals. When her appeals were unsuccessful, she filed this lawsuit—about two years after the initial incident.

---

[1] At the hearing, the parties disputed whether B.B. testified that Becerra told her the Drawing was racist. Although B.B.'s deposition is unclear, the Court must construe her testimony in the light most favorable to B.B.

1       Shortly after Chelsea filed her complaint with the school, B.B.'s brother, K.B., was distraught and walking around the school's courtyard when he was supposed to be in class. *Id.* # 25. Becerra radioed for Victa, a counselor at the school, to join him at the blacktop and help get K.B. back to class. *Id.* Victa feared that K.B. would abscond from campus, so she followed him around the blacktop at a distance. *Id.* # 27; *see also* Ex. A at 0:00-1:47 (Dkt. 78). B.B., on her way to the restroom, encountered Victa and K.B. Victa asked B.B. to help get her brother back to class. *Id.* B.B. approached her brother, and the two began walking together. Ex. A at 1:47. B.B. testified that she asked Victa to stop following them, but Victa continued to supervise the two children from a significant distance. *Id.* B.B. then went to the restroom to call her mother and ask for her to pick them up from school. While B.B. was in the bathroom, Victa called into the bathroom to ask whether anyone was inside, and Victa left the bathroom when she did not hear a response. B.B.'s mother picked both B.B. and K.B. up from school. B.B. testified that, during this interaction, Victa was nice to her. SUF # 31. This incident on the schoolyard blacktop forms the basis of Plaintiff's final three causes of action—retaliation, intentional infliction of emotional distress, and negligent supervision.

    **B. Procedural History**

      Plaintiff's original complaint, filed in February 2023, had seven causes of action. At the motion to dismiss stage, the Court dismissed the causes of action brought by B.B.'s mother and dismissed the Monell claims against CUSD. See generally Order (Dkt. 55); Order Dkt. 69). Plaintiff's surviving causes of action are: (1) Violation of the First Amendment against Becerra (42 U.S.C. § 1983), (2) Retaliation in Violation of the First Amendment against Becerra and Victa (42 U.S.C. § 1983), (3) Intentional Infliction of Emotional Distress against Becerra and Victa, and (4) Negligent Supervision against CUSD.

      Defendants moved for summary judgment on all four of these causes of action on January 12, 2024. Plaintiff filed her Opposition ("Opp'n") (Dkt. 75) on January 22, 2024. Defendants submitted their Reply (Dkt. 79) on January 29, 2024. The Court heard oral argument on Defendant's motion on February 12, 2024.

**II.    LEGAL STANDARD**

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248–49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible, evidence identifying the basis for the dispute. *See id.* The Court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

## III. DISCUSSION

The Court addresses each of the Plaintiff's four causes of action in turn.

### A. First Amendment Claim

Plaintiff argues that Becerra's response to the Drawing—compelling her to apologize to M.C., prohibiting her from drawing other pictures for her friends, and preventing B.B. from playing at recess for two weeks[2]—violates her First Amendment right to free speech. Opp'n at 7-12. However, this schoolyard dispute, like most, is not of constitutional proportions.

#### 1. Legal Background Regarding School Speech

Although students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969), their rights are "not automatically coextensive with the rights of adults in other settings." *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 682 (1986). For school children, the First Amendment must be "applied in light of the special characteristics of the school environment." *Tinker*, 393 U.S. at 506. Because educators best understand those special characteristics, courts give "educators substantial deference as to what speech is appropriate." *LaVine v. Blain Sch. Dist.*, 257 F.3d 981, 988 (9th Cir. 2001). "[T]he determination of what manner of speech is inappropriate" at school "properly rests with the school board, rather than with the federal courts." *Hazlewood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 266 (1988) (internal quotations omitted).

There are three categories of student speech, each with its own line of Supreme Court precedent. The parties in this case agree that the Drawing falls in the third category, pure speech, which is governed by *Tinker*. "Under *Tinker*, schools may restrict speech that 'might reasonably lead school authorities to forecast substantial disruption of or material interference with school activities' or that collides 'with the rights of other students to be secure and let alone.'" *Wynar v. Douglas Cnty. Sch. Dist.*, 728 F.3d 1062, 1070 (9th Cir. 2013) (quoting *Tinker*, 393 U.S. at 508).

---

[2] There is no direct evidence that Becerra instructed the teachers to tell B.B. that she could not play at recess because of the Drawing. However, given the close temporal proximity between Becerra's conversation with B.B. and the teacher's punishment, a reasonable jury could infer that Becerra directed this punishment. *Cf. Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741 (9th Cir. 2001) (concluding that "proximity in time between the protected action and the allegedly retaliatory employment decision" precluded summary judgment on a retaliation claim).

Much of the caselaw applying *Tinker* focuses on its "substantial disruption" prong. As a result, "[t]he precise scope of *Tinker*'s 'interference with the rights of others' language is unclear." *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001) (Alito, J.); *see also Parents Defending Education v. Olentangy Local Sch. Dist. Bd. of Educ.*, __ F. Supp. 3d __, 2023 WL 4848509, at * 9 (S.D. Ohio 2023) ("*Parents*"). However, the cases reveal three principles that help identify when speech unduly infringes on the rights of other students such that it is not protected under the First Amendment.

First, where speech is directed at a "particularly vulnerable" student based on a "core identifying characteristic," such as race, sex, religion, or sexual orientation, educators have greater leeway to regulate it. *Harper v. Poway Unified Sch. Dist.*, 445 F.3d 1166, 1181-83 (9th Cir. 2006), *vacated as moot by*, 549 U.S. 1262 (2007); *see also J.C. v. Beverly Hills Unified Sch. Dist.*, 711 F. Supp. 2d 1094, 1122-23 (C.D. Cal. 2010). Although speech that is "merely offensive to others" cannot be regulated, *C.R. v. Eugene Sch. Dist. 4J*, 835 F.3d 1142, 1153 (9th Cir. 2016), courts have recognized that denigrations based on protected characteristics do more than offend—they can inflict lasting psychological harm and interfere with the target student's opportunity to learn. *See, e.g.*, *Harper*, 445 F.3d at 1179; *Parents*, 2023 WL 4848509 at * 13. These types of denigrations, moreover, have little countervailing benefit to the learning environment. Derogatory speech is therefore "not the conduct and speech that our educational system is required to tolerate, as schools attempt to educate students about 'habits and manners of civility' or the 'fundamental values necessary to the maintenance of a democratic political system.'" *Kowalski v. Berkeley Cnty. Schs.*, 652 F.3d 565, 574 (4th Cir. 2011) (quoting *Bethel*, 478 U.S. at 681). Thus, "[w]hatever the outer boundary of *Tinker*'s interference inquiry," the case law "establish[es] that students have the right to be free" from speech that "denigrate[s] their race" while at school. *Shen v. Albany Unified Sch. Dist.*, 2017 WL 5890089, at * 10 (N.D. Cal. Nov. 29, 2017).

Second, the mere fact that speech touches upon a politically controversial topic is not sufficient to bring it under the First Amendment's protective umbrella. In *Harper*, for instance, the district court denied a preliminary injunction brought by a student who was told that he

could not wear a homophobic shirt to school. The Ninth Circuit affirmed the district court despite the "political disagreement regarding homosexuality" that existed at the time. *Id.* at 1181; *see also Parents*, 2023 WL 4848509 at * 9 - * 13 (upholding a school's regulation prohibiting speech that is both derogatory and the subject of societal disagreement against a First Amendment challenge). At the same time, however, school administrators must have a justification above the "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint" before they may regulate student speech. *Tinker*, 393 U.S. at 510.

Third, and most pertinent for the present case, age is an important factor when deciding whether speech is protected. In *Tinker*, the Court held that a high school could not ban students from wearing black arm bands that signaled opposition to the Vietnam War. *Id.* at 514. The Court emphasized that denying students this type of expression—which neither interfered with the school environment nor intruded on other students' rights—may coerce political orthodoxy and "strangle the free mind" of high school students. *Id.* at 507. An elementary school, by contrast, is not a "marketplace of ideas." *Muller by Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1538 (7th Cir. 1996). Thus, the downsides of regulating speech there is not as significant as it is in high schools, where students are approaching voting age and controversial speech could spark conducive conversation. *See Zamecnik v. Indian Prairie Sch. Dist. No. 204*, 636 F.3d 874, 876 (7th Cir. 2011). As the Seventh Circuit has recognized, elementary schools "are more about learning to sit still and be polite, rather than robust debate." *Muller*, 98 F.3d at 1538. To fulfill that mission, elementary schools require significant latitude to discipline student speech. Indeed, "much—perhaps most—of the speech that is protected in high grades" may be regulated in elementary schools. *Walker-Serrano ex rel. Walker v. Leonard*, 325 F.3d 412, 417-18 (7th Cir. 2003).

"The targeted student's age is also relevant to the analysis." *C.R.*, 835 F.3d at 1153. Younger students may be more sensitive than older students, so their educational experience may be more affected when they receive messages based on a protected characteristic. Relatedly, first graders are impressionable. If other students join in on the insults, the disruption

could metastasize, affecting the learning opportunities of even more students. *See id.* at 1153 n.5.

### 2. Application

Giving great weight to the fact that the students involved were in first grade, the Court concludes that the Drawing is not protected by the First Amendment. B.B. gave the Drawing to M.C., a student of color.[3] The Drawing included a phrase similar to "All Lives Matter," a sentence with an inclusive denotation but one that is widely perceived as racially insensitive and belittling when directed at people of color.[4] Indeed, M.C.'s mother testified that those kinds of messages "hurt." Soon after discovering the Drawing in M.C.'s backpack, M.C.'s mother emailed the school, and stated that she believed her daughter received the Drawing because of her race. Based on this email and the content of the Drawing, Becerra concluded that the Drawing interfered with the right of M.C., a first grader, "to be let alone."[5] *See Tinker*, 393 U.S. at 503.

Undoubtedly, B.B.'s intentions were innocent. B.B. testified that she gifted the Drawing to M.C. to make her feel comfortable after her class learned about Martin Luther King Jr. But *Tinker* does not focus on the speaker's intentions. Rather, it examines the effects of speech on the learning environment and other students, giving deference to school officials' assessments about what speech is acceptable in an educational setting. *See Wynar*, 728 F.3d at 1071; *Pinard v. Clatskanie Sch. Dist. 6J*, 467 F.3d 755, 766 (9th Cir. 2006). Such deference to schoolteachers is especially appropriate today, where, increasingly, what is harmful or innocent speech is in the eye of the beholder. Teachers are far better equipped than federal courts at identifying when speech crosses the line from harmless schoolyard banter to impermissible harassment. Here,

---

[3] There is no direct evidence that M.C. is a student of color; however, there is strong circumstantial evidence to support such a finding.

[4] The phrase "All Lives Matter" gained popularity in response to the growth of the Black Lives Matter movement ("BLM"), a social movement protesting violence against Black individuals and communities, with a focus on police brutality. "All Lives Matter" can be seen as an offensive response to BLM because that phrase obscures "the fact that [B]lack people have not yet been included in the idea of 'all lives.'" Daniel Victor, *Why 'All Lives Matter' is Such a Perilous Phrase*, N.Y. TIMES, (Jul. 15, 2016), https://www.nytimes.com/2016/07/16/us/all-lives-matter-black-lives-matter.html.

[5] Plaintiff argues that Becerra's punishment was not justified because the speech was directed at only one student, M.C. Opp'n at 12. However, "[n]othing in the Supreme Court's decision in *Tinker* suggests that more than one student's right to be secure and let alone need be materially invaded before school officials" act. *Castro v. Clovis Unified Sch. Dist.*, 604 F. Supp. 3d 944, 952 (E.D. Cal. 2022). In fact, that the speech was targeted at one person may weigh in favor of a finding that the speech invaded that person's rights.

Becerra concluded that the Drawing, although well-intentioned, fell on the latter side of that line.

A parent might second-guess Becerra's conclusion, but his decision to discipline B.B. belongs to him, not the federal courts. Elementary schoolteachers make thousands of disciplinary decisions on American playgrounds every day. Federal court review of all these decisions would unduly interfere with school administration and overwhelm the judiciary. Regardless of whether Becerra was right or wrong, the decision is his, and this schoolyard dispute—like most—does not warrant federal court intervention.

Summary Judgment is GRANTED on Plaintiff's First Amendment claim.

**B. First Amendment Retaliation Claim**

The First Amendment prohibits government officials from retaliating against individual for their speech. *See Blair v Bethel Sch. Dist.*, 608 F.3d 540, 543 (9th Cir. 2010). Plaintiff argues that Becerra retaliated against her for the Drawing when he punished her for the Drawing, and when Becerra did not step in to prevent Victa from following B.B. and her brother on the blacktop one year after the Drawing. Opp'n at 16-17. Plaintiff also argues that Victa's decision to follow B.B. and her K.B. after "B.B. asked her to go," was in retaliation for the Drawing. Opp'n at 18.

"To establish a First Amendment retaliation claim in the student speech context, a plaintiff must show that (1) [s]he engaged in a constitutionally protected activity, (2) the defendant's actions would chill a person of ordinary firmness from continuing to engage in the protected activity, and (3) the protected activity was a substantial or motivating factor in the defendant's conduct." *Pinard*, 467 F.3d at 770 (9th Cir. 2006). As discussed above, the Drawing was not "constitutionally protected activity," so Defendants Becerra and Victa are entitled to summary judgment on Plaintiff's retaliation claim. *See id.*

Defendants Becerra and Victa are also entitled to summary judgment for a separate reason: They would have—and, indeed, should have—addressed the situation on the blacktop. K.B., an elementary school student, was walking in a circle, distraught and refused to return to his class. Victa was concerned that K.B. would abscond from campus. B.B. joined her brother

on the blacktop and asked Victa, who was following the duo at a significant distance, to leave the two of them alone. It would have been irresponsible for Victa to leave K.B. unsupervised while he was in a distressed state. Because the undisputed evidence shows that Becerra and Victa "would have taken the same action even in the absence of" the Drawing, Plaintiff's First Amendment retaliation claim fails as a matter of law. *See Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 750 (9th Cir. 2001).

Therefore, the Court GRANTS Defendants' Motion for Summary Judgment on Plaintiff's First Amendment Retaliation Claim.

**C. State Law Claims**

Plaintiff's two other claims arise under California law, and the only basis for federal subject matter jurisdiction over them is supplemental jurisdiction. "A district court should dismiss a supplemental state law claim where all of the claims over which it had original jurisdiction have been dismissed." *Khosroabadi v. North Shore Agency*, 439 F. Supp. 2d 1118, 1125 (S.D. Cal. 2006) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726-27 (1966)); *see also Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997). Given the Court's dismissal of Plaintiff's federal claims, the Court DECLINES supplemental jurisdiction over Plaintiff's state law claims.

Plaintiff may refile her state claims in state court. B.B. and M.C. have undoubtedly moved on from this incident that occurred three years ago. B.B. stated that the Drawing did not strain the friendship between them. They have taught us an important lesson about moving on.

## IV. DISPOSITION

For the foregoing reasons, the Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's federal law claims. The Court **DECLINES** supplemental jurisdiction over Plaintiff's state law claims. Those claims are **DISMISSED WITHOUT PREJUDICE**. Plaintiff may refile the state law claims in state court.

All future dates in this matter are **VACATED**.

DATED: February 22, 2024

*David O. Carter*

DAVID O. CARTER
UNITED STATES DISTRICT JUDGE